# IN THE SUPREME COURT OF IOWA

No. 07–1333

Filed October 22, 2010

**BENJAMIN FELD, LARRY FELD,** and **JUDITH FELD,**

Appellants,

vs.

**LUKE BORKOWSKI,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Carroll County, Dale E. Ruigh, Judge.

Plaintiffs appeal from summary judgment entered by the district court in an action by one participant in a softball practice against a coparticipant for injuries sustained when struck by a bat. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED; CASE REMANDED FOR TRIAL.**

Gregory J. Siemann of Green, Siemann & Greteman, P.L.C., Carroll, and Dan Connell of Dan Connell, P.C., Storm Lake, for appellants.

Joel T.S. Greer of Cartwright, Druker & Ryden, Marshalltown, for appellee.

**CADY, Justice.**

This appeal arises from an action by a participant in a softball practice against a coparticipant for head injuries suffered from a flying bat when the defendant released his bat while hitting a pitched ball. We primarily consider the application of the contact-sports exception and the sufficiency of evidence to support a finding of recklessness. The district court granted summary judgment for the defendant. We transferred the case to the court of appeals, who affirmed the decision of the district court. We granted further review. On our review, we vacate the decision of the court of appeals, reverse the decision of the district court, and remand for trial.

## I. Background Facts and Prior Proceedings.

Benjamin Feld and Luke Borkowski were teammates on an intramural slow-pitch sixteen-inch softball team, composed of male high school students, during the summer of 2005. Feld and Borkowski were experienced players, having played various levels of the game throughout their childhoods. The team assembled to play games against other teams and to practice among themselves. Practice primarily consisted of batting practice, which allowed each player the opportunity to swing at approximately twenty pitches before the next player rotated into the batter's position. The team members who were not batting or pitching played various field positions, except catcher, and attempted to catch or retrieve the balls.

During a batting practice on June 2, 2005, Feld was playing first base while Borkowski batted. Home plate and first base were sixty feet apart, the customary arrangement in slow-pitch softball. Borkowski, a right-handed hitter, swung at pitch after pitch using an aluminum bat. He was known as a strong hitter. After about a dozen pitches, Borkowski hit a high fly ball into foul territory on the third base side of the field. A split second after the bat made contact with the ball, it left Borkowski's hands. Most of the team

watched the fly ball sail over the head of the third baseman as the bat, almost simultaneously, flew directly down the first baseline, in a horizontal helicopter motion, toward Feld. Borkowski yelled Feld's nickname in an effort to warn him of the flying bat. The warning was ineffective, and the bat struck Feld in the forehead. Feld suffered a severe injury to his left eye.

Feld and his parents filed a negligence action against Borkowski. The lawsuit sought damages for medical expenses and other associated damages. Borkowski denied the claims of negligence in his answer to the petition and asserted assumption of the risk as an affirmative defense. He also claimed softball was a contact sport, and no liability could be imposed because his conduct was not reckless. Following discovery, Borkowski moved for summary judgment on the grounds liability was limited under the contact-sports exception and the facts of the incident failed to generate a jury question that his conduct was reckless.

In resistance to the motion for summary judgment, the Felds first argued that softball is not a contact sport, as a matter of law, and therefore did not qualify for the exception to the rule of negligence. In the alternative, the Felds claimed Borkowski's actions in releasing the bat constituted reckless conduct. In support of this argument, the Felds presented expert testimony from Ed Servais, head baseball coach at Creighton University. Servais is an experienced college coach and a former baseball player. He testified he had never seen a right-handed batter hit a ball left of third base and lose control of a bat by releasing it in the direction of first base. Further, Servais testified the only way a right-handed batter could hit a first baseman with a bat in such a manner is if the batter "followed through and rotated around after striking the foul ball and deliberately threw the bat or let go of the bat in such a way that it was flung with considerable force through the air towards the first base position." Thus, the Felds claimed,

even if the contact-sports exception to negligence applied, an issue of material fact existed as to whether Borkowski acted recklessly or intentionally in losing control of his bat.

The parties disputed the manner in which the bat left Borkowski's hands after he hit the pitch. Borkowski maintained the bat slipped from his sweaty hands on the hot June day, he did not rotate his body completely around before releasing the bat, and he did not intentionally throw the bat towards first base. Members of the team, including Borkowski, referred to the incident as "a freak accident."

Following a hearing, the district court granted Borkowski's motion for summary judgment. The court found softball qualified as a contact sport because it is an "athletic activit[y] which involve[s] the general risk of physical injury to the participants," and liability could only be based on reckless or intentional conduct. The court concluded Borkowski's actions were not outside the normal course of playing softball because any misconduct would have occurred while swinging at a pitch during softball practice. Although the court recognized Feld may not have accepted the risk of being struck by a bat at first base, it concluded the risks were not specific to the type of injury he received, but instead included all inherent dangers in the normal course of playing softball. The district court also found the contact-sports exception barred the claim against Borkowski because the Felds failed to allege in their petition that Borkowski's conduct was reckless or deliberate.

The Felds filed an appeal from the district court's order granting summary judgment. They claimed the district court erred in finding softball to be a contact sport. Additionally, they claimed the summary judgment facts generated a jury question on whether the conduct of Borkowski was reckless. Finally, they claimed the contact-sports exception was inapplicable

to the particular circumstances of this case because those circumstances showed Feld did not accept the risk of the particular injury he sustained. In the end, the Felds believed the case should be tried under a negligence standard, yet based solely on the argument that softball was not a contact sport.

We transferred the case to the court of appeals. The court of appeals affirmed the district court, concluding physical contact is generally inherent in the game of softball and there was no conclusive evidence of recklessness sufficient to present an issue of material fact for a fact finder. The Felds sought, and we granted, further review.

## II. Standard of Review.

We review a district court's ruling on a motion for summary judgment for correction of errors at law. *Sweeney v. City of Bettendorf*, 762 N.W.2d 873, 877 (Iowa 2009). Summary judgment is appropriate when the moving party proves no genuine issue of material fact exists on the record. *Berte v. Bode*, 692 N.W.2d 368, 370 (Iowa 2005). If reasonable minds can differ on how a material fact issue should be resolved, summary judgment should not be granted. *Hills Bank & Trust Co. v. Converse*, 772 N.W.2d 764, 771 (Iowa 2009). We make every legitimate inference that can be reasonably deduced from the evidence in favor of the nonmoving party. *Id.*

## III. Analysis.

**A. Contact-Sports Exception.** As a general rule, our law recognizes that every person owes a duty to exercise reasonable care to avoid causing injuries to others. *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009); Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7(a), at 77 (2010) [hereinafter Restatement (Third)]. A breach of this duty will subject the actor to liability if the injury caused by the actor's conduct resulted from the risks that made the actor's conduct negligent.

Restatement (Third) § 6, at 67; *Thompson*, 774 N.W.2d at 839. In most all cases involving physical harm, we have adopted the view that a duty of reasonable care exists, and it is for the fact finder to consider the specific facts and circumstances to determine if the actor breached the duty. *Thompson*, 774 N.W.2d at 834–35.

While the duty to exercise reasonable care accompanies each individual in most all activities of life, some activities or circumstances have been excepted from the reasonable-care duty in favor of the imposition of a less stringent duty of care for participants in the activity to protect others from injury. *See id.* (recognizing occasions when countervailing principles and policies justify displacement or modification of the general duty to exercise reasonable care). One such activity that has been identified as an exception is contact sports. Prior to our decision in *Thompson* to follow the analytical framework of the Restatement (Third) of Torts for claims of negligence involving physical harm, we followed other states in excepting participants in contact sports from constraining their actions under the conventional duty to act as a reasonable person. *See Leonard ex rel. Meyer v. Behrens*, 601 N.W.2d 76, 81 (Iowa 1999).[1] In finding the game of paintball

---

[1]The Restatement (Third) provides the general duty to exercise reasonable care may be modified or displaced "when an articulated countervailing principle or policy" justifies a special rule of liability. Restatement (Third) § 7, at 77. Although we adopted the contact-sports exception prior to *Thompson*, our decision in *Leonard* fits within a special rule for liability in the sports context found in the Restatement (Third) of Torts. *See Leonard*, 601 N.W.2d at 79–80 (striking a balance between competing interests, including the need to preserve "vigorous and active participation in contact sports without fear of liability for merely negligent bodily contact," and the need to diminish public-policy concerns over the flood of litigation that would result under a negligence standard against the interest in protecting those who participate in those events). Thus, *Leonard* followed the *Thompson* framework, and our adoption of the Restatement (Third) in *Thompson* did not undermine our prior adoption of the contact-sports exception in *Leonard*. In fact, the Restatement (Third) specifically recognizes that the contact-sports exception is an example of a recognized exception to the reasonable-care standard under its approach. Restatement (Third) § 7 cmt. *a*, at 78. Importantly, the Restatement (Third) does not focus on how courts should identify occasions when a different duty replaces the reasonable-care standard. Instead, it expresses the notion that a reasonable-care duty applies in each case *unless* a special duty,

to be a contact sport in *Leonard,* we imposed a duty for participants in the sport to merely refrain from reckless or intentional conduct. *Id.* at 81 ("We therefore hold that paintball is a contact sport for which a participant's liability is determined under a recklessness standard."); *see also Pfister v. Shusta,* 657 N.E.2d 1013, 1013 (Ill. 1995) (holding contact-sports exception imposes "the duty to refrain from willful and wanton or intentional misconduct"); Restatement (Third) § 7 cmt. *a,* at 78 (recognizing "some courts have modified the general duty of reasonable care for those engaging in competitive sports to a more limited duty to refrain from recklessly dangerous conduct"). This standard recognizes that known risks associated with a contact sport are assumed by participants in the sport, and it is inapposite to the competitiveness of contact sports to impose a duty on participants to protect coparticipants from such known and accepted risks through the exercise of reasonable care.[2] *See Leonard,* 601 N.W.2d at 79 & n.3 (noting assumption of the risk in its primary sense is a defense to negligence). The standard also recognizes that athletes who step onto the playing field to compete are not completely free from legal responsibility for their conduct that creates a risk of injury, but are restrained under a substantially lower duty of care. *See Nabozny v. Barnhill,* 334 N.E.2d 258, 260–61 (Ill. App. Ct. 1975).

---

like the contact-sports exception, is specifically recognized. *Id.* § 7, at 77. The Restatement (Third) primarily sought to eliminate specific arguments that no duty of care exists under a particular set of circumstances. *Id.* § 7 cmt. *a,* at 77.

[2]The assumption-of-the-risk underpinning of the contact-sports exception does not mean that a participant in a contact sport is barred from recovery due to his own contributory negligence. The assumption-of-the-risk doctrine, in that respect, has been abolished in Iowa. *See Coker v. Abell-Howe Co.,* 491 N.W.2d 143, 148 (Iowa 1992). Rather, assumption of the risk in this context merely reflects the evolution of the policy basis for this modified duty rule. This rule does not bar plaintiffs in contact sports from recovery altogether, but instead recognizes that the various risks associated with contact sports justify a modified duty of care.

In examining the extent or scope of the contact-sports exception, we recognize a sport involving contact between participants or contact with instruments or objects used by participants provides knowledge and understanding to the participants of the inherent risks of harm that can be created. This applies not only by the conduct that occurs within the rules and objectives of the sport, but also by conduct from participants who fail to properly execute an activity contemplated by the sport. *See Leonard*, 601 N.W.2d at 79 (recognizing that participants in athletic events voluntarily endure "risks normally associated with the activity"). As we observed in *Leonard*, the violation of a sport's rules creates a risk of injury to participants that would not necessarily exist without the infraction, such as when players run into punters in football, midfielders are high-sticked in lacrosse, basketball players are fouled, batters are hit by pitched balls in baseball, and hockey players are tripped. *Id.* at 80. Yet, such contact is nevertheless inherent in each game because no participant can play the game error free. Thus, players accept risks of harm inherent in a sport both derived from activities that are executed as contemplated by the sport and activities that are improperly executed. For example, a base runner in softball can be struck and injured by a ball hit by a batter or can be struck and injured by a wild throw from a fielder. In both instances, the risk of harm from contact is inherent in the game, even though the batter is credited with a hit and the fielder is charged with an error. These known risks, under the contact-sports exception, support a duty of care less stringent than reasonable care.

In contrast, conduct by participants done with reckless disregard for the safety of others or with an intent to harm others beyond the rules and objectives of the sport creates risks that are not inherent in the sport. *See id.* at 79–80. Such risks do not inhere in the sport because conduct

involving recklessness or intent to harm presents risks substantially greater than risks of negligent conduct. *See* Restatement (Second) of Torts § 500, at 587 (1965) [hereinafter Restatement (Second)] (risk involved in reckless conduct is "substantially greater" than risk involved in negligent conduct).[3] For example, the risk of harm to a base runner in softball is much greater when a fielder throws a ball intended to hit the base runner than when a fielder throws a ball to another fielder, intending for the other fielder to complete the play by tagging or forcing the base runner out, but instead misfires and hits the runner with the ball. Thus, the recklessness standard captures conduct that imposes risks of harm to participants that are not a normal part of the sport. *See Leonard,* 601 N.W.2d at 79–80 ("[I]njuries inflicted intentionally or as the result of reckless disregard for safety are not assumed.").

The parties to this case do not challenge the viability of the contact-sports exception in Iowa, but only challenge its application to the sport of softball. Our obligation on appeal is to decide the case within the framework of the issues raised by the parties. *Worthington v. Kenkel,* 684 N.W.2d 228, 234 (Iowa 2004). Consequently, we do no more and no less.[4]

---

[3]The American Law Institute published a revised definition of "recklessness" in its most current Restatement. Restatement (Third) § 2, at 16–17. The drafters acknowledge that the current standard of recklessness is "somewhat more restrictive" than the Restatement (Second) standard. *Id.* cmt. *c,* at 19. Primarily, the standard provided in the Restatement (Third) differs from the Restatement (Second) by focusing on the obviousness of the danger presented by the conduct. *Id.* We do not address the issue of adopting the substance of the Restatement (Third) standard for recklessness in this case.

[4]We recognize our obligation to construe the law in resolving legal issues presented on appeal independent of any construction advocated by the parties. The arguments of the parties do not constrain us in our obligation to search for and apply controlling law to resolve legal issues. *See Rants v. Vilsack,* 684 N.W.2d 193, 211–12 (Iowa 2004) (applying controlling law to reach a result not advocated by either party). However, in the absence of the most cogent circumstances, we do not create issues or unnecessarily overturn existing law sua sponte when the parties have not advocated for such a change. *See, e.g., Pierce v. Pierce,* 287 N.W.2d 879, 882 (Iowa 1980) (recognizing subject matter jurisdiction issues will be considered sua sponte because an appeal pursuant to improper jurisdiction is contrary to governing rules of procedure); *Sisson v. Janssen,* 244 Iowa 123, 130–31, 56 N.W.2d 30,

The threshold inquiry is whether the activity or sport engaged in by the parties was an activity or game covered by the contact-sports exception. This analysis does not focus on whether the participants were engaged in a formally organized or coached sport, but instead centers on whether the activity inherently involves the risk of injurious contact to participants. *See Leonard*, 601 N.W.2d at 80–81 (applying the recklessness standard to an informal game of paintball and rejecting formality and organization as threshold qualifications). Not all sports inherently involve contact capable of injury. Yet, even the description of a particular sport as a contact sport can vary depending upon the purpose for which a sport is classified as a contact activity. *See* 34 C.F.R. § 106.41(b) (2009) (defining contact sports for purposes of gender discrimination on school sports teams and excluding softball as a contact sport). Notwithstanding, the purpose of deciding whether an activity is a contact sport is to determine if the risk of harm of injurious contact was known and understood as a part of the sport. If the risk of injury is a part of the sport, then the participants must only refrain from reckless or intentional conduct causing injury.

**B. Softball as a Contact Sport.** With this background in mind, we turn to answer the issue presented by the arguments of the parties. In the sport of softball, the risk of injury to participants includes the risk of contact between a participant and a bat swung by a batter, as well as other risks of

_____

34 (1952) (noting the issue of "unclean hands" may be raised sua sponte by the court, even though no party advocates it due to the strong public interest in equitable proceedings). *See also Varnum v. Brien*, 763 N.W.2d 862, 884 n.9 (Iowa 2009) (questioning sua sponte the viability of the threshold test used to dispose of equal protection claims, but refusing to abandon the test until parties in a future case could present the full arguments since the plaintiffs nevertheless satisfied the threshold test and suffered no prejudice by its application). In this case, we are restrained to apply the controlling law as advocated by the parties, and we do not consider or forecast whether or not that controlling law should be abandoned or changed in favor of a duty of reasonable care or modified by a standard staking out some middle ground.

contact from other actions by participants that are part of the game. Batting and swinging a bat are normal and expected activities of the game, and participants familiar with the sport know and understand that a risk of harm is presented to other participants by the activity. In particular, a bat can be released from the hands of a batter during a swing. This scenario presents a risk of harm from injurious contact between the bat and other participants on or around the playing field.

Nevertheless, the Felds argue that liability should not be limited to recklessness or intentional conduct by generally labeling a sport as a contact sport. Instead, they argue the particular contact involved in causing the injury in each case must be analyzed to determine if the specific incident involved contact that should have been anticipated. The Felds assert this analysis is consistent with the underlying assumption-of-the-risk premise of the contact-sports exception. Thus, they argue softball may be a contact sport for a player like a catcher, but not for an individual playing first base when a right-handed hitter hits a ball left of the third baseline. More specifically, the Felds argue no first baseman could have anticipated harm from a bat under the circumstances of the case.

In *Leonard*, we examined the nature, objectives, rules, and traditions of the particular sport or game to determine if paintball was a contact sport so as to exempt participants from liability for injury to coparticipants predicated on negligence. 601 N.W.2d at 81. We did not dissect the game to determine if certain parts should be subjected to the exception, but looked at the game itself. This approach is consistent with the purpose of maintaining the desired spirited competition in sports; the law cannot expect competitors in a contact sport to play under multiple standards of care, just as it cannot expect competitors in a contact sport to apply standards of reasonableness

when engaged in conduct that only presents a risk of harm inherent in the sport.

Thus, we conclude softball for purposes of tort liability is a contact sport, and this conclusion is sufficient to transform liability for an injury sustained by a participant while engaged in the sport from a standard of negligence to a standard of recklessness. Clearly, batting is normal activity in the sport of softball and creates a risk of harm to participants in a number of ways, including a risk that the bat will be released during the swing in some way and will become an instrument of harm to participants in some way. Other jurisdictions that have examined liability in the context of softball have similarly concluded that softball presents inherent risks that qualify the sport for the recklessness standard. *See, e.g., Landrum v. Gonzalez,* 629 N.E.2d 710, 715 (Ill. App. Ct. 1994); *Picou v. Hartford Ins. Co.,* 558 So. 2d 787, 790 (La. Ct. App. 1990); *Crawn v. Campo,* 643 A.2d 600, 608 (N.J. 1994); *O'Neill v. Daniels,* 523 N.Y.S.2d 264, 264–65 (N.Y. App. Div. 1987). As such, the contact-sports exception applies in this case, and Borkowski can only be liable for the injurious contact with Feld if his actions were intentional or reckless.

**C. Reckless Conduct.** The district court concluded the Felds failed to claim in their petition that Borkowski was reckless, and the undisputed facts presented in the course of the summary judgment proceedings did not support a finding of recklessness as a matter of law. It found Feld accepted the risk of harm presented by a batter who negligently released a bat from his hands while swinging at a pitch, even though it would be unforeseeable that a first baseman would be in the zone of danger for contact with a bat by a right-handed hitter who had swung and hit the pitch with the bat.

We commence our review of this portion of the district court decision by recognizing that our inquiry is to determine whether the Felds presented

facts sufficient to support a jury question on the issue of whether Borkowski's actions in releasing the bat during the swing was reckless. We begin by noting it is not fatal to the Felds' lawsuit that he only asserted a claim for negligence in his petition rather than asserting a claim for both negligence and recklessness. Borkowski raised the contact-sports exception as a defense. The contact-sports exception was also the basis for Borkowski's motion for summary judgment, and the Felds resisted the summary judgment by arguing Borkowski's conduct amounted to recklessness. The Felds' resistance to the motion for summary judgment placed the issue of recklessness squarely in play, predicated on the understanding that it supported an actionable claim for liability based on recklessness.[5] *See Rieff v. Evans*, 630 N.W.2d 278, 292 (Iowa 2001) ("[W]e do not require a petition to allege a specific legal theory."); *see also Smith v. Smith*, 513 N.W.2d 728, 730 (Iowa 1994) ("A petition gives 'fair notice' if it informs the defendant of the incident giving rise to the claim and of the claim's general nature."). Thus, the question is whether the Felds produced sufficient evidence of recklessness to withstand summary judgment.

We find the affidavit from Ed Servais, the long-time baseball coach, supported a jury question on recklessness. The facts are undisputed that Borkowski swung at a pitch and struck the bottom portion of the softball with the bat. The contact between the bat and ball resulted in a high foul ball outside the third baseline. The path of the ball after it was hit revealed

---

[5]The contact-sports exception is not an affirmative defense to a claim for negligence so as to require the defendant to plead and prove the defense. It is a doctrine that limits liability by modifying the standard of care. *Leonard*, 601 N.W.2d at 81. Once an activity is determined to be a contact sport, a plaintiff must plead and prove a claim for recklessness. *See* 57A Am. Jur. 2d *Negligence* § 274, at 339 (2004) ("Once an actor's conduct is determined to be reckless, his or her liability for harm resulting from that behavior is determined by the same rules that determine the liability of a negligent actor; to state a claim upon which relief may be granted, the plaintiff must still prove facts demonstrating the existence of the basic elements of duty, breach, proximate cause, and damages.").

Borkowski swung too early to hit the pitch into the playing field. Up to the point of the bat's contact with the pitch, nothing occurred out of the ordinary to support a claim of recklessness. However, Borkowski's actions that followed during the split second after he struck the ball were far from normal. In his experience as a player and coach, Servais had never seen or even heard of a first baseman being hit by a bat released from the hands of a right-handed hitter who had hit the pitched ball to the left side of the third baseline. Moreover, Servais attempted to duplicate such an occurrence without success, which led him to the conclusion that Borkowski must have deliberately released the bat in a very abnormal, contorted act of recklessness.

Importantly, the affidavit of Servais supports a reasonable conclusion that Borkowski did not continue to swing the bat in a normal manner after he hit the ball. The rare abnormality of the bat's flight pattern after the ball was struck at least supports an inference of recklessness. An act performed by a participant in a sport that produces a radically different result from the normal and expected result of the act, even when performed negligently, gives rise to an inference that the result was purposeful.

A party resisting summary judgment is entitled to "every legitimate inference that can reasonably be deduced from the evidence." *Cent. Nat'l Ins. Co. v. Ins. Co. of N. Am.*, 522 N.W.2d 39, 42 (Iowa 1994). Here, the Servais affidavit gives rise to a reasonable inference of recklessness. Considering all the facts presented in the summary judgment proceedings, a jury could conclude Borkowski, knowing he had swung ahead of the pitch and that his body was out of position to make solid contact with the ball, continued his swing in a very unorthodox manner and released the bat in momentary frustration and anger. This inference is sufficient to support a jury question on recklessness. *See Leonard*, 601 N.W.2d at 80 ("[I]n order to

prove recklessness as the basis for a duty, a plaintiff must show that the actor has intentionally done an act of an unreasonable character in disregard of a known risk or a risk so obvious that the actor must be taken to have been aware of it and so great as to make it highly probable that harm would follow."); *accord* Restatement (Second) § 500, at 587.

## IV. Conclusion.

We conclude the district court erred in granting summary judgment. We vacate the decision of the court of appeals, reverse the judgment of the district court, and remand for further proceedings.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED; CASE REMANDED FOR TRIAL.**

All justices concur except Wiggins, J., who concurs specially, and Appel, J., who concurs specially with Wiggins, J., joining divisions I and III(A) and Hecht, J., joining in its entirety.

**WIGGINS, Justice (concurring specially).**

I concur in the result by joining in divisions I and III(A) of Justice Appel's special concurrence. The majority opinion clings to the contact-sports exception on the grounds neither party urges its abandonment. As Justice Appel rightly points out in division I of his special concurrence, the question of the continued viability of the contact-sports exception is clearly before us. Moreover, we cannot let the parties' narrow framing of an issue preclude us from applying the proper analysis to an issue. In past cases where the parties did not raise the applicability of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, we have applied the Restatement (Third) when necessary to properly analyze the issues before the court. *Brokaw v. Winfield-Mt. Union Cmty. Sch. Dist.*, 788 N.W.2d 386, 391 (Iowa 2010); *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 849 (Iowa 2010); *Van Fossen v. MidAmerican Energy Co.*, 777 N.W.2d 689, 696–98 (Iowa 2009); *Thompson v. Kaczinski*, 774 N.W.2d 829, 834–40 (Iowa 2009).

The procedural posture of this case makes it even more important for us to address the issue under the Restatement (Third). The majority opinion reverses the district court's order granting Borkowski's motion for summary judgment and remands the case for a trial on the merits. We have recently adopted section seven of the Restatement (Third) as the proper duty analysis in a negligence case. *Thompson*, 774 N.W.2d at 834–36. Therefore, the duty analysis under section seven of the Restatement (Third) is the controlling law on remand. The Restatement (Third) leaves the question open as to whether the court should instruct on a more limited duty when competitive sports are involved. Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7 cmt. *a,* at 77–78 (2010). The majority does not reach this issue,

finding the parties failed to preserve and raise it. As I previously noted, I disagree and say we should reach this issue now.

By not reaching this issue, the majority leaves the district court and the parties with a terrible dilemma. The court has an obligation to cover all the legal principles involved in a case when it instructs the jury. *Greninger v. City of Des Moines*, 264 N.W.2d 615, 617 (Iowa 1978). Accordingly, the court must consider section seven of the Restatement (Third) when it writes its instructions. The Felds will probably urge the court to hold the contact-sports exception does not have a sound foundation in today's sports world and that it has no viability under a Restatement (Third) analysis. Therefore, they will urge the court to instruct the jury as it would in any other negligence action. On the other hand, Borkowski will probably urge the court to keep the contact-sports exception and request the court to instruct the jury using a recklessness standard. At that time, the district court will have to decide if the contact-sports exception is still viable under a Restatement (Third) analysis. No matter how the court rules, we will probably see another appeal where we must decide if the contact-sports exception is still viable under a Restatement (Third) analysis.

In writing this concurrence, I feel compelled to ask the majority a couple of questions. Why should we leave the question unanswered when the district court will be confronted with it on remand? Why are we creating a potential appeal on this issue under the Restatement (Third) when we can answer the question now? It seems to me, for us not to address the issue creates extra expense for the parties and the court. Accordingly, I would address the issue head on and give the contact-sports exception a proper burial.

**APPEL, Justice (concurring in part and dissenting in part).**

This case raises two substantive issues.  The first substantive issue is whether there is a special limited-duty rule for contact sports under Iowa law that applies to the game of softball.  If so, a second question arises, namely, whether the contact-sports exception should prevent liability based on negligence under the facts and circumstances of this case.

For the reasons stated below, I would reject application of the contact-sports exception to softball.  In the alternative, I would hold that there is a factual question regarding whether the conduct in this case was outside the scope of the ordinary risks of softball and, therefore, subject to liability based on negligence.

## I.  Matters Properly Before the Court.

In the proceedings below, the plaintiff framed the argument narrowly as to whether the game of softball falls within the contact-sports exception.  In making this argument, the plaintiff clearly and indisputably has maintained the case should be tried as an ordinary negligence claim.  The plaintiff, however, did not argue that the contact-sports exception should be eliminated altogether.  The question thus arises whether it is proper for the court to address the larger question in this appeal.

The question of when an issue not argued by the parties should be decided by the court involves a number of considerations.  Although sometimes discussed in a conclusory fashion as involving "issue preservation" or "waiver," the field is, in fact, considerably more nuanced.

On the one hand, the judicial process is normally driven by the parties.  They bring their cases to the court and ask the court to decide the issues they present.  Judges are not advocates who reach out to decide questions the parties themselves either deem unimportant or, for whatever

reasons, fail to raise. The job of the court is to decide concrete cases the parties bring to it.

On the other hand, judges should not allow the parties' framing of the issues to usurp the judicial function. The courts, and not the parties, are responsible for the coherent development of law. This is particularly true when courts are performing their common law function. A judicially-driven decision may produce a more accurate statement of law. Amanda Frost, *The Limits of Advocacy*, 59 Duke L.J. 447, 452 (2009) [hereinafter Frost]. The courts are not some kind of private arbitration service working for the parties and no one else. *Id.* at 474.

It is the tension between these two roles of deciding cases and developing the law that must be resolved in this case when we consider whether to address the ongoing validity of the contact-sports exception when the parties have declined to expressly address it in their briefs. *See generally* Chad M. Oldfather, *Defining Judicial Inactivism: Models of Adjudication and the Duty to Decide*, 94 Geo. L.J. 121, 164–75 (2005) (discussing the scope of a court's adjudicative duty).

The United States Supreme Court has addressed this kind of question by distinguishing between a claim and an argument. As noted by Sarah Cravens, the Supreme Court has made it clear that once a claim is properly presented, a party is not limited to arguments presented below. Sarah M. R. Cravens, *Involved Appellate Judging*, 88 Marq. L. Rev. 251, 259 (2004) [hereinafter Cravens]; *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378–83, 115 S. Ct. 961, 965–66, 130 L. Ed. 2d 902, 909–13 (1995). Further, the Court has emphasized that it "is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 99, 111 S. Ct. 1711, 1718,

114 L. Ed. 2d 152, 166 (1991). Whether to exercise this independent power is said to be a question of prudence. *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446–47, 113 S. Ct. 2173, 2178, 124 L. Ed. 2d 402, 412–13 (1993).

The Supreme Court has been willing to employ this flexible, discretionary approach to determining whether it should decide an issue not argued by the parties in several important cases. For example, in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), the United States Supreme Court overruled *Swift v. Tyson*, 41 U.S. 1, 10 L. Ed. 865 (1842), even though neither party argued that it should be overturned. Frost, 59 Duke L.J. at 450. In *Washington v. Davis*, 426 U.S. 229, 96 S. Ct. 2040, 48 L. Ed. 2d 597 (1976), the Supreme Court held that the constitution prohibited only intentional discrimination although both parties indicated that it barred disparate racial impact. *Id.* In *Dickerson v. United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000), the Supreme Court considered the question of whether a statute governing the admission of confessions displaced *Miranda* even though the question was not raised by the parties. *Id.*

The leading commentator on Supreme Court practice has stated that the decision to confront a question not raised by the petition for certiorari " 'is not circumscribed by any particular formula' " and " 'reflects the Court's discretionary authority to dispose of cases in what it determines to be the most sensible and reasonable way.' " *Id.* at 463 (quoting Robert L. Stern et al., *Supreme Court Practice* 346 (7th ed. 1993)). While the Supreme Court has stated that it "ordinarily" does not consider questions outside the certiorari petition, the practice is "prudential," not jurisdictional. *See Yee v. City of Escondido*, 503 U.S. 519, 535, 112 S. Ct. 1522, 1532–33, 118 L. Ed. 2d 153, 170 (1992); *Blonder-Tongue Labs. v. Univ. of Ill. Found.*, 402 U.S.

313, 320 n.6, 91 S. Ct. 1434, 1439 n.6, 28 L. Ed. 2d 788, 794–95 n.6 (1971) (stating that the rule "does not limit our power to decide important questions not raised by the parties."). On occasion, the Supreme Court orders supplemental briefing by the parties or amici. Cravens, 88 Marq. L. Rev. at 268.

High courts in other states have, from time to time, been willing to consider arguments not raised by the parties. Every law student studies the famous case of *MacPherson v. Buick Motor Co.*, 111 N.E. 1050 (N.Y. 1916). In that case, the plaintiff sought to sue an automobile manufacturer for an allegedly defective vehicle. *MacPherson*, 111 N.E. at 1051. Under existing law, however, the doctrine of privity barred the plaintiff from bringing a claim against the manufacturer, with whom the plaintiff had no direct contact, unless the plaintiff could show that the automobile was "inherently dangerous." *Id.* As a result, the plaintiff argued that an automobile was "inherently dangerous." *Id.*

Justice Cardozo did not address the narrow argument made by the plaintiff. Instead, after canvassing the applicable law, Cardozo held that the larger doctrine which required privity of contract for a purchaser to bring a claim against a manufacturer was no longer good law. *Id.* at 1053. According to Cardozo, "We have put aside the notion that the duty to safeguard life and limb, when the consequence of negligence may be foreseen, grows out of contract and nothing else." *Id.*

Although Iowa courts are not governed by the "case or controversy" restrictions in Article III of the United States Constitution, we have held that a plaintiff may not raise a new theory of liability after trial. *See, e.g., Field v. Palmer*, 592 N.W.2d 347, 351 n.1 (Iowa 1999); *Shill v. Careage Corp.*, 353 N.W.2d 416, 420 (Iowa 1984); *Gosha v. Woller*, 288 N.W.2d 329, 331 (Iowa 1980). Our cases, however, are generally not inconsistent with the approach

of the United States Supreme Court distinguishing between a claim, which must be raised below and argued in briefs on appeal, and an argument in support of a preserved claim.

Indeed, we have been willing to relax ordinary rules of issue preservation based on notions of judicial economy and efficiency. For example, we may decide evidentiary questions not presented to the district court where we reverse a decision of the district court but the record reveals an alternate ground for admission of the evidence. *DeVoss v. State*, 648 N.W.2d 56, 60–63 (Iowa 2002).

We have also stated that we will address issues that are "incident" to a determination of other issues properly presented. *Presbytery of Se. Iowa v. Harris*, 226 N.W.2d 232, 234 (Iowa 1975). In this case, it seems to me, the issues here are so intertwined—namely, whether the contact-sports exception should be embraced and whether a contact-sports exception should apply in softball, that there is no insurmountable obstacle to our consideration of the larger issue.

In summary, we are not confronted with a case where the issue—whether the plaintiff may proceed with a cause of action based on negligence—was not raised or ruled upon by the district court. The case thus does not fall within the hardcore area where arguments on appeal should rarely, if ever, be entertained. Nor is this a case where the factual record developed below is inadequate, thereby preventing meaningful appellate review.

On the other hand, there are some good reasons to consider the larger question. This case is a classic example of intertwined issues. It is one thing to decline to address an issue not raised where orderly development of the law is not affected, but it is quite another thing to refuse to consider the

policy underpinnings of a doctrine while at the same time extending it into new and uncharted territory.

Because the parties chose to present only the narrow argument that the contact-sports exception should not be extended to softball, the majority sees itself as locked into the contact-sports doctrine and has no choice but to extend it outside the context previously established by Iowa case law even though there is a substantial question regarding its ongoing validity. I regard this approach as ceding the court's fundamental authority to develop the law to the parties. *See* Frost, 59 Duke L.J. at 472 (arguing that litigants should not wrest away from courts the interpretation of law). Yet, while refusing to consider the validity of the underlying doctrine, the court at the same time considers the question of whether the contact-sports doctrine is consistent with the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, an issue that, like the question of the continued validity of the contact-sports exception, was not briefed by the parties.

Further, because public policy is at the heart of the contact-sports exception, this case presents the kind of dispute that even Professor Eisenberg, who generally endorses the adversary or participatory model of adjudication, believes justifies the relaxation of the ordinary rules. *See generally* Melvin Aron Eisenberg, *Participation, Responsiveness, and the Consultative Process: An Essay for Lon Fuller*, 92 Harv. L. Rev. 410 (1978). Indeed, under the Restatement (Third) of Torts, the contact-sports exception, as a special rule to ordinary negligence, can only be adopted if there are compelling public policies in support of the special rule. Further, in common law cases, courts must make decisions on grounds of policy because of their implications for future cases. Craven, 88 Marq. L. Rev. at 255.

In any event, if there is a reluctance to address the broader question because of the failure of the parties to make this argument, we should order the parties to file supplemental briefs to address the issue rather than render an opinion based on what may prove to be a fatally flawed premise. There is no reason not to order supplemental briefs in order to ensure that this court "gets it right" now rather than wait for an additional case to come along. Supplemental briefing would also promote fairness to the parties by ensuring that they have an opportunity to weigh in on the larger issue. *See* Adam A. Milani & Michael R. Smith, *Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts,* 69 Tenn. L. Rev. 245, 287 (2002) (advocating that when courts use discretion to decide issues not raised by parties, supplemental briefing should be requested to avoid abuse of discretion).

I would have ordered the parties to present supplemental briefing on the larger issues presented in this case. Since such briefing has not been ordered, the case must be decided as is in a less than optimum posture. Nonetheless, I am convinced that there is ample reason not to extend the contact-sports exception to this case for the reasons expressed below.

Before discussing my views on the merits, it is important to note what this case means. The continued validity of the contact-sports exception and its viability and scope under the Restatement (Third) of Torts are not addressed by a majority of the members of the court and therefore remain open questions. The court may have reached a result on this appeal, but it has left the law in this area murky and uncertain.

**II.  The Contact-Sports Exception.**

**A. Development of the Contact-Sports Exception.**  Prior to 1975, plaintiffs were generally allowed to recover in sports injury cases based on a showing of ordinary negligence. *See Crawn v. Campo,* 630 A.2d 368, 370–71

(N.J. Super. Ct. App. Div. 1993). The first noteworthy case to depart from the traditional application of negligence law to sports-injury cases was the Illinois case of *Nabozny v. Barnhill*, 334 N.E.2d 258 (Ill. App. Ct. 1975). In *Nabozny*, the court introduced an innovation into the law, namely, that the ordinary rules of negligence do not generally apply in the context of contact sports, including soccer. *Nabozny*, 334 N.E.2d at 260–61. Instead, sports injuries are only actionable if they are the result of reckless or intentional conduct. *Id.* The *Nabozny* court offered several policy reasons for this deviation. The court cited the need "to control a new field of personal injury litigation." *Id.* at 261. The *Nabozny* court also asserted "that the law should not place unreasonable burdens on the free and vigorous participation in sports by our youth." *Id.* at 260.

Since *Nabozny*, the question of whether to alter the application of traditional negligence in sports-injury cases has not been decided in many jurisdictions. *See generally* Matthew G. Cole, *No Blood No Foul: The Standard of Care in Texas Owed by Participants to One Another in Athletic Contests*, 59 Baylor L. Rev. 435, 443–57 (2007) (cataloguing status of the contact-sports exception in all fifty states). In those that have, a majority of courts have departed from traditional precedents and developed a common law innovation that has been labeled as the "contact-sports exception" to ordinary rules of tort liability. *See, e.g.*, *Knight v. Jewett*, 834 P.2d 696, 711 (Cal. 1992); *Jaworski v. Kiernan*, 696 A.2d 332, 337 (Conn. 1997); *Pfister v. Shusta*, 657 N.E.2d 1013, 1017–18 (Ill. 1995).

The courts adopting the contact-sports exception have often cited the policy concerns of *Nabozny*, namely, that immunity for negligent conduct is essential to ensure vigorous competition and to impede the filing of lawsuits over sports injuries. *Knight*, 834 P.2d at 710; *Jaworski*, 696 A.2d at 337; *Pfister*, 657 N.E.2d at 1018. Further, the cases suggest that application of

the ordinary standard of care could alter the way in which the game is played and require integral parts of sports to be abandoned. *Knight*, 834 P.2d at 710.

The doctrine employed to avoid these untoward consequences is usually assumption of risk. It is claimed the normal expectations of participants in contact sports include the potential for injuries, participants assume the risk of injuries, and therefore there should be no negligence liability for such injuries. *See Jaworski*, 696 A.2d at 336–37; *Pfister*, 657 N.E.2d at 1017–18.

While most courts that have considered the matter have adopted the contact-sports exception, a minority have rejected it. A leading minority case is *Lestina v. West Bend Mutual Insurance Co.*, 501 N.W.2d 28 (Wis. 1993), *superseded by statute*, Wis. Stat. § 895.525(4m) (1995), *as recognized in Noffke ex rel. Swenson v. Bakke*, 748 N.W.2d 195 (Wis. Ct. App. 2008). In *Lestina*, the Wisconsin Supreme Court considered whether to apply an ordinary negligence standard in an action arising out of injuries suffered in a soccer game. *Lestina*, 501 N.W.2d at 29. In rejecting the contact-sports exception, the *Lestina* court emphasized that the proponents of the contact-sports exception failed to realize negligence is a flexible standard that is adaptable to a wide range of conduct. *Id.* at 33. According to the *Lestina* court:

> The very fact that an injury is sustained during the course of a game in which the participants voluntarily engaged and in which the likelihood of bodily contact and injury could reasonably be foreseen materially affects the manner in which each player's conduct is to be evaluated under the negligence standard.

*Id.* As a result, the *Lestina* court found that the negligence doctrine was sufficiently flexible to permit "vigorous competition" and to give adequate

consideration to other factors cited in support of the contact-sports exception. *Id.*

The New Hampshire Supreme Court in *Allen v. Dover Co-Recreational Softball League*, 807 A.2d 1274 (N.H. 2002), came to a similar conclusion. In *Allen*, the court considered whether the plaintiff could recover under a negligence theory for injuries resulting from an errantly thrown softball. *Allen*, 807 A.2d at 1283. Citing *Lestina*, the court rejected the reckless standard of the contact-sports exception. *Id.* at 1284. The court noted that in ordinary negligence cases, "a participant . . . 'who creates only risks that are normal or ordinary to the sport acts as a reasonable person of ordinary prudence under the circumstances.' " *Id.* at 1284 (quoting *Crawn*, 630 A.2d at 373). A participant acts in an unreasonable manner only when the participant increases or creates a risk outside the range of risks that flow from participation in the sport. *Id.* at 1285.

Another case that rejects the contact-sports exception is *Auckenthaler v. Grundmeyer*, 877 P.2d 1039 (Nev. 1994). In this case, the Nevada Supreme Court considered whether a horse rider could bring a negligence claim to recover for injuries sustained from a kick from another rider's horse. *Auckenthaler*, 877 P.2d at 1040. As in *Lestina*, the *Auckenthaler* court emphasized the flexibility of the negligence standard. *Id.* at 1043. The court also, however, noted that the contact-sports exception was "merely another way of recognizing implied assumption of risk through the back door or by way of duty/risk principles." *Id.* at 1044. The *Auckenthaler* court noted that Nevada's comparative fault statute abolished assumption of risk and left no room for the special rule. *Id.* Finally, the *Auckenthaler* court observed that the claims regarding the flood of litigation and the chilling effect upon participation in recreational activities "seem overstated." *Id.* The court

found very few cases where plaintiffs had recovered based upon ordinary negligence in sporting contexts.  *Id.*

**B.  Application of the Contact-Sports Exception to Softball.**  There are several cases that consider whether softball should be considered a contact sport for the purposes of any exception to ordinary negligence law. In the majority of cases, courts have held that softball was a contact sport, albeit in highly conclusory language.  *See Blancher v. Metro. Dade County*, 436 So. 2d 1077, 1079 (Fla. Dist. Ct. App. 1983); *Landrum v. Gonzalez*, 629 N.E.2d 710, 714–15 (Ill. App. Ct. 1994).  Softball, however, was not found to be a contact sport in *Cahill v. Carella*, 648 A.2d 169 (Conn. Super. Ct. 1994). In *Cahill*, the court noted that while some contact will occasionally and accidentally occur in recreational softball games, softball is not a contact sport.  *Cahill*, 648 A.2d at 174.

**C.  Scope of the Contact-Sports Exception.**  Some of the cases dealing with the contact-sports exception contain broad, unqualified statements that recovery for injuries suffered in the course of contact sports requires a showing of recklessness.  However, in a number of cases that have adopted the contact-sports exception, there have been some clearly drawn limitations on the doctrine.

Limitations to the contact-sports exception finds support in a relatively early case regarding assumption of risk.  As stated by Chief Justice Cardozo, a party who engages in a sporting activity "accepts the dangers that inhere in it *so far as they are obvious and necessary*."  *Murphy v. Steeplechase Amusement Co.*, 166 N.E. 173, 174 (N.Y. 1929) (emphasis added).  The limitation of assumption of risk to "obvious and necessary" risks has been carried forward in sports cases.  For instance, in the frequently cited case of *Turcotte v. Fell*, 502 N.E.2d 964 (N.Y. 1986), the court noted that the contact-sport exception applies only to risks "that are known, apparent or reasonably

foreseeable." *Turcotte*, 502 N.E.2d at 967. And, as the California Supreme Court has repeatedly emphasized: "[D]efendants generally do not have a duty to protect the plaintiff from the risks inherent in the sport, or to eliminate risk from the sport . . . . [T]hey generally do have a duty [however] not to increase the risk of harm beyond what is inherent in the sport." *Kahn v. E. Side Union High Sch. Dist.*, 75 P.3d 30, 38 (Cal. 2003).

**D. Developments in Tort Law Following Adoption of the Contact-Sports Exception.** Since the advent of the contact-sports exception, there have been significant developments in tort law. One such development is the adoption of the Restatement (Third) of Torts. The Restatement (Third) of Torts provides that "[a]n actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm." Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 7(a), at 77 (2010). The Restatement (Third) of Torts, moreover, has an overarching philosophy, namely, that the duty of care owed by one to another in matters involving personal safety is ordinarily the generally-applicable negligence standard and that the question of whether that generally-applicable standard has been breached is a factual question for the jury. *See id.* at § 6 cmt. *f*, at 69, § 7 cmt. *a*, at 77–78. The Restatement (Third) of Torts eschews special judge-made rules that apply in narrow situations as incoherent and inconsistent with the overarching architecture of our modern tort law. *See also Yount v. Johnson*, 915 P.2d 341, 342 (N.M. Ct. App. 1996) (noting the law has "moved forcefully towards a public policy that defines duty under a universal standard of ordinary care, a standard which holds all citizens accountable for the reasonableness of their actions [and] away from judicially declared immunity or protectionism, whether of a special class, group, or activity").

That said, section 7 of the Restatement (Third) of Torts does reserve special duty rules for "exceptional cases." Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 7(b) (2010). Section 7(b) provides, "In exceptional cases . . . a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification." *Id.* And, while implied assumption of risk is disapproved in section 2 of the Restatement (Third) of Torts: Apportionment of Liability, comment *j* expressly declines to take a position on the application of limited duty in sports cases. Restatement (Third) of Torts: Apportionment of Liability § 2, cmts. *i, j*, at 21–22 (2000).

**E. Iowa Case Law Regarding the Contact-Sports Exception.** This court in a per curiam opinion in *Leonard ex rel. Meyer v. Behrens*, 601 N.W.2d 76, 80–81 (Iowa 1999), embraced without discussion the contact-sports exception in the context of a game of paintball. In *Behrens*, the very purpose of the sport, paintball, involved shooting other participants with projectiles. *Behrens*, 601 N.W.2d at 77–78. Because of the contact inherent in the activity, the court determined that a special rule of liability requiring recklessness was applicable. *Id.* at 80–81.

The court cited *Dudley v. William Penn College*, 219 N.W.2d 484 (Iowa 1974), in support. *Behrens*, 601 N.W.2d at 79. *Dudley*, however, involved a failure to supervise claim against a coach and college brought by a player who was hit by a foul ball while sitting in an unprotected dugout. *Dudley*, 219 N.W.2d at 486. In *Dudley*, the court affirmed a directed verdict for lack of causal connection, noting, in passing, "Most injuries in athletic contests result from the rough and tumble of the game itself." *Id.* at 486.

Next, the *Behrens* court briefly cited but did not analyze sports cases. *Behrens*, 601 N.W.2d at 79–81. It relied upon the language in *Jaworski* for the twin propositions that if negligence were the standard in coparticipant-

athletic-injury cases, vigorous play would be affected and there would be a flood of litigation. *Id.* at 80. And so, the social policies of promoting vigorous competition and avoiding lawsuits in the sport of paintball demanded that, as a matter of law, unreasonable conduct proximately causing serious eye injuries was immune from liability. *Id.* at 81.

**III. Application of Principles.**

**A. Analysis of the Underpinnings of the Contact-Sports Exception.** This court adopted the Restatement (Third) of Torts in *Thompson. Thompson v. Kaczinski*, 774 N.W.2d 829, 835 (Iowa 2009). While the Restatement (Third) of Torts applies a duty of care, it does allow for specific public policy exceptions to the generally-applicable standard of care. Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 7(b) (2010). Generally speaking, the public policy supporting an exception must be compelling. *Id.* Otherwise, our tort law will be a minefield of formalistic and incoherent doctrine. Like the per curiam decision in *Behrens*, the majority does not adequately discuss the policy basis for such an exception for contact sports. I am fearful that under the approach of the majority, the ground work has been laid for a series of judge-made exceptions, which if unabated could create a hodgepodge of our tort law. As I see it, because of the lack of strong policy reasons, the adoption of a reduced standard of care in contact sports is simply another way of recognizing implied assumption of risk through the back door of duty principles. *Auckenthaler*, 877 P.2d at 1044. The public policy rationale behind the contact-sports exception has no sound basis for a number of reasons.

First, the contact-sports cases generally do not adequately take into consideration the flexibility of negligence as a cause of action. In order for a defendant to be found negligent, the defendant's acts or omissions must be found to be unreasonable under all the facts and circumstances of the

particular case. As emphasized in *Lestina* and *Allen*, a key fact and circumstance of a sports-injury case is the competitive environment in which it occurs. *Allen*, 807 A.2d at 1285; *Lestina*, 501 N.W.2d at 33. In applying ordinary negligence standards, the fact that a defendant was engaged in a competitive sport that involved direct physical contact would be a critical and often an outcome-determining factor on the issue of negligence. Conduct that would be a tort on Eighth and Main is perfectly acceptable on the football field. Thus, even the sports cases applying the negligence standard generally would be consistent with the observation in *Dudley*, namely, that "[m]ost injuries in athletic contests result from the rough and tumble of the game itself." *Dudley*, 219 N.W.2d at 486.

As a result, sports injuries that occur in the ordinary course of a contact sport would not give rise to negligence claims. As noted in *Allen*, it would be part of the ordinary course of reasonable play for a player to throw a ball in an errant direction in a softball game. *Allen*, 807 A.2d at 1286. Such an act, absent aggravating factors that increase the ordinary risk of the game, would not amount to negligence. *Id.*; *see also McGee v. Bd. of Educ.*, 226 N.Y.S.2d 329, 331–32 (App. Div. 1962) ("Players . . . must accept the risks to which their roles expose them. Of course, this is not to say that actionable negligence can never be committed on a playing field. Considering the skill of the players, the rules and nature of the particular game, and risks which normally attend it, a participant's conduct may amount to such careless disregard for the safety of others as to create risks not fairly assumed."). Only when a defendant acts unreasonably in light of the goals and purposes of the game, including vigorous competition, would a cause of action arise. *See* 4 Fowler V. Harper et al., *The Law of Torts* § 21.5, at 239–40 & n.17 (2d ed. 1986) (criticizing the contact-sport exception on

ground that, properly understood, ordinary negligence provides the appropriate framework for sports cases).

Second, the contact-sports exception does not adequately take into consideration our comparative-fault framework. In Iowa, comparative fault has abolished assumption of risk, one of the main underpinnings of the contact-sports exception. Iowa Code § 668.1(1) (2005). The legislature has not crafted an exception for contact sports. In many cases, assumption of risk provides the analytical framework for special rules for sports participants. In Iowa, a special duty rule cannot be fashioned based on this type of assumption of risk. The majority seems to anticipate what the legislature should have done, or perhaps will do, namely, craft an exception to comparative fault, rather than rely upon what the current law provides.

Third, I question whether "the sky is falling" approach of the contact-sports cases bears any reasonable relationship to reality. For example, in *Jaworski*, the Connecticut Supreme Court declared:

> If simple negligence were adopted as the standard of care, every punter with whom contact is made, every midfielder high sticked, every basketball player fouled, every batter struck by a pitch, and every hockey player tripped would have the ingredients for a lawsuit if injury resulted.

*Jaworski*, 696 A.2d at 338. Such quotable language has been cited slinky-style in a string of case law that includes *Behrens*, but has no factual basis.

For example, prior to 1975, before the development of the contact-sports exception, there is no evidence that sports competition was being suppressed by negligence law. The players in the historic Army-Navy games, or those who participated in state basketball tournaments in that golden era, would be stunned to learn that the members of this court sitting in our conference room thirty-five years later have concluded that their participation in these events was less vigorous because of their concern

about the prevailing tort law. Furthermore, it would be preposterous to believe that after the *Lestina* decision of the Wisconsin Supreme Court in 1993, Iowa athletic teams who traveled to Wisconsin for away games played differently than they did at home, or in Wisconsin in the years prior to the decision. Similarly, in jurisdictions like Nevada and Arizona, where sports teams have achieved national prominence, there is no evidence that vigorous competition has been impacted by appellate court decisions that have explicitly rejected the contact-sports exception. Further, no one seriously claims that athletic competition over recent decades is less vigorous in the many states where there is no authority one way or the other on the contact-sports exception.

After over four decades of experimentation with the special rule in some states, no special rule in other states, and uncertainty in many states, one would think the states as laboratories of democracy would have produced some evidence to support the speculation of courts regarding "vigorous competition." The lack of evidence over this prolonged period of time is a powerful indicator that the vigorous competition policy rationale of the contact-sports exception has no basis in fact.

In any event, one might wonder, in today's world, whether vigorous competition needs the "breathing room" provided by a recklessness standard. As noted in one leading sports law text, "the evidence is accumulating that, on every level of competition, participants need to be restrained and not emboldened." *See* Ray Yasser et al., *Sports Law: Cases and Materials* 720 (4th ed. 2000). To the extent tort rules would affect behavior in the context of athletics, the elimination of the contact-sports exception would promote a sense of restraint, a sense that the game has to be played within the rules, a sense of respect for the bodily integrity and person of the opposing player. There is a word that encompasses these

traits—sportsmanship.  I am old-fashioned enough to want our tort system to give this traditional value contemporary life.

Fourth, the bogeyman of an "avalanche of lawsuits," that reliable and hoary chestnut that is relied upon whenever there is potential liability, has no more validity in the sports context than in most contexts in which it is applied.  The majority of cases upon which it relies cite no evidence of an avalanche of lawsuits in states that have rejected or have not yet embraced the contact-sports exception.  Indeed, in Iowa, there was no reported case involving coparticipants in sports until the court considered the exotic sport of paintball in *Behrens* in 1999.  In short, not one case involving coparticipants in football, basketball, baseball, softball, or soccer came to this court for resolution prior to 1999.  There was no threatened "avalanche of litigation" in Iowa, then or since.

Indeed, the leading case with the inflated rhetoric about the potential "avalanche of litigation" comes from the Connecticut Supreme Court in *Jaworski.*  Mark M. Rembish, *Liability for Personal Injuries Sustained in Sporting Events After* Jaworski v. Kiernan, 18 Quinnipiac L. Rev. 307, 337–38 (1998).  Yet in the fifty-five-year period from 1941, when the Connecticut Supreme Court held that negligence was the standard in sports cases, until 1997, when *Jaworski* announced its contact-sports exception, the reported cases in Connecticut involving coparticipants in sports cases amounted to the grand total of two!  *Id.* at 338.

In any event, even if there were a semblance of reality to the myth of a litigation avalanche, adoption of the contact-sports exception is just as likely to increase litigation as it is to diminish it.  Here is the argument: advocates of the contact-sports exception believe that it will encourage robust and vigorous play; the more robust and vigorous the play, the more injuries are likely to occur; and the more injuries that occur, the more litigation results.

*See* Thomas F. Miller, *Torts and Sports: Has Michigan Joined the Wrong Team with* Ritchie-Gamester, 48 Wayne L. Rev. 113, 131 (2002). I do not claim to have empirical evidence to support this line of reasoning, but it is just as likely to be correct as any opposite conclusion.

I further question the underlying premise of the "avalanche of litigation" theory. First, it reaches too far. If the "avalanche of litigation" theory were a driving principle of tort law, it would have more application in the world of airplanes and automobiles than competitive sports. Second, it is just wrong. The tort system exists to compensate persons who are injured by the unreasonable conduct of others.

It may be, I suppose, that there is an unarticulated reason behind the "avalanche of litigation" theory, namely, a mistrust of juries to do the right thing. Yet, we trust juries to do the fact finding in complicated matters ranging from medical malpractice to business tort cases. If juries can handle these types of cases, they can surely be trusted with cases arising from competitive sports injuries.

Fifth, assuming that the application of ordinary negligence would have some mild deterrent effect on play and produce a few additional lawsuits, this would not be an untoward development. The cases that embrace the contact-sports exception generally note that there must be a balance between the interests of promoting vigorous participation in sports and the safety of participants. *See Ross v. Clouser*, 637 S.W.2d 11, 14 (Mo. 1982). In the last three or four decades, there is one empirical fact that the majority ignores and no knowledgeable person challenges—there has been an epidemic of sports injuries among children. *See* Griffin Toronjo Pivateau, *Tackling the Competitive Sports Doctrine: A New Proposal for Sports Injuries in Texas*, 9 Tex. Rev. Ent. & Sports L. 85, 88 nn.8–9 (2007) (citing statistics from the U.S. Consumer Products Safety Commission and the National

Center for Injury Prevention and Control showing substantial increase in sports injuries in recent years).

The increase in injuries in contact sports has had a number of adverse effects. For those injured due to unreasonable conduct, the adverse effects are self-evident. Further, however, the increasingly dangerous nature of competitive sports has tendencies to deter participation by those who might be willing to play but who do not wish to be exposed to the risk of injuries from unreasonable conduct. For those who wish to promote broadly the values of athletics across the culture, the contact-sports exception may be self-defeating. If it is true that application of the negligence doctrine would modestly deter unreasonable conduct, the time has come to tip the balance in the direction of safety and potentially broader participation.

For the above reasons, I question whether the contact-sports exception has a sound foundation in fact or law in today's sports world.

**B. Softball as a Contact Sport.** Because of my concerns regarding the validity of the contact-sports exception generally, I have no interest in seeing it expanded outside the limited context of *Behrens*, which emphasizes that the very purpose of the sport is to strike an opposing player. *Behrens*, 601 N.W.2d at 77–78. As a result, I would conclude that softball is outside the scope of *Behrens* and is not a contact sport for purposes of the rule. The primary purpose of softball does not involve clashing bodies like that of football or rugby. There is no doubt that, on relatively rare occasions, a participant in a softball game may be injured by an errant throw of a ball or a bat. Hitting participants with balls and bats, however, is not the purpose of the sport. There is, of course, incidental contact, but there is occasional incidental contact in golf (thrown clubs and misdirected shots), ping-pong (flying mallets and spinning balls to the eye), and the racing of toads (participants bumping into one another as they urge their champions to

victory). There are ordinarily no immunities for injuries arising from these types of incidental contact, and I would not apply them to the game of softball.

Aside from my policy concerns, I also have technical concerns with developing some kind of imprecise and irrelevant category of "contact" vs. "noncontact" sport. It is a meaningless exercise. This is the kind of pointless labeling that we recently rejected in *Koenig*. *See generally Koenig v. Koenig*, 766 N.W.2d 635, 643–45 (Iowa 2009) (abolishing the distinction between invitees and licensees in premises liability). Instead of some kind of grand categorization of sports, the better approach, even if one were to embrace the immunity rule sought by the majority, is not to divide sports into categories, but instead look at the fundamental nature of any competitive sport and determine whether the injury was the result of an inherent risk of the game, i.e., a risk that is part and parcel of the activity and necessary if the game is to be played at all. If the answer is yes, then a special duty rule might apply. If the answer is no, then ordinary negligence applies.

It makes no sense at all to adopt the blunt and imprecise categorization approach that has the potential of being both overbroad and underinclusive. I, of course, doubt that the court would be willing to extend the contact-sports exception to sports like golf, table tennis, and the racing of toads, but this is an argument against the rule in the first place.

Further, not all "softball" is the same. An informal game of softball involving children and adults may operate by one set of rules and generate gentle expectations, while a highly competitive game involving adults played for high stakes may involve more risk of physical contact. In this case, there is no elaboration in the record other than the game was a slow-pitch softball game involving seventeen year olds playing in an organized league. These

facts alone, in my view, are not sufficient to declare that this softball game was a "contact sport."

In any event, if forced to make a choice in a bipolar world, I would conclude that softball is not a contact sport. Unlike football or paintball, for example, the very purpose of the game does not involve the collision of bodies or projectiles. I do not believe the nature of the game of softball will be dramatically changed by a rule imposing liability for negligence under all the facts and circumstances. I would, therefore, not apply any special immunity to the game.

**C. Scope of the Contact-Sports Exception.** Even if the court decides to embrace the contact-sports exception and even if softball is declared by verbal bludgeon to be a contact sport, it is clear even from the case law upon which the majority relies that this is not the end of the matter. The immunities of any special rule that the majority adopts plainly do not extend to *every* occasion when a participant is injured.

In my view, under the better-reasoned contact-sports cases, a person who commits acts or omissions that create risks that are outside the ordinary risks inherent in a game are subject to liability sounding in *negligence*. Such acts or omissions "increase the risk of harm beyond what is inherent in the sport." *Kahn*, 75 P.3d at 38. The proper standard of liability in these situations is ordinary negligence, not recklessness. *See Phi Delta Theta Co. v. Moore*, 10 S.W.3d 658, 662–63 (Tex. 1999) (Enoch, J., dissenting).

Here, the plaintiff is entitled to assert that the throwing of the bat by this right-handed hitter behind his back all the way down to the first baseman with its resultant injuries was not an inherent and inevitable part of the game but was outside the risks associated with the activity. An expert testified that in thirty years of coaching softball, he had never seen this kind

of incident. As a result, there is a factual question regarding whether the acts of the defendant fell outside the scope of the contact-sports exception and therefore triable as an ordinary negligence action.

### IV. Conclusion.

In light of the underlying weakness in the contact-sports rationale, I would not permit it to drift outside its moorings. As a result, I would not extend the contact-sports exception to an amateur game of softball. At a minimum, whether the contact-sports exception applies involves a careful consideration of the facts and circumstances.

Even assuming the contact-sports exception applies to the game involved in this case, the rule does not immunize negligent conduct that is *outside the inherent risk of the activity*. In this case, at a minimum, the plaintiff is entitled to argue that the conduct involved—the throwing of a bat by a right-handed batter who twirls around and throws the bat with sufficient force to strike the first baseman, what was indisputably an extraordinary and unheard of event—presents a danger that was outside the inherent risk of the game and, as a result, subjects the actor to liability based on ordinary negligence.

Wiggins, J., joins divisions I and III(A) of this special concurrence and Hecht, J., joins this special concurrence in its entirety.